964 A.2d 678

Clarence HENRY

v.

STATE of Maryland.

No. 946, Sept. Term, 2007.

Court of Special Appeals of Maryland.

Feb. 4, 2009.

Amy E. Brennan (Nancy S. Forster, Public Defender on the brief), Baltimore, for appellant.

Steven L. Holcomb (Douglas F. Gansler, Attorney General on the brief), Baltimore, for appellee.

Panel: MEREDITH, WRIGHT, RAYMOND G. THIEME, JR., JJ., (Retired, specially assigned).

WRIGHT, J.

By indictment filed in the Circuit Court for Prince George's County on August 15, 1997, the appellant, Clarence Henry, was charged with two counts of first degree murder (Counts 1 and 3) and two counts of use of a handgun in a crime of violence (Counts 2 and 4). Henry, who was 15 years old when the offense occurred, filed a motion to transfer the case to juvenile court as well as a motion to suppress the statement he made to police. On December 12, 1997, a hearing on the motion to remand to juvenile court was held. That motion

was denied. On January 30, 1998, the court held a hearing on the motion to suppress, which was also denied.

Following a jury trial held on February 23–25, 1998, Henry was convicted of two counts of second degree murder and two counts of use of a handgun in the commission of a crime of violence. On March 27, 1998, Henry was sentenced as follows:

Count 1: 30 years for the second degree murder of William Curry, with credit for time served;

Count 2: 20 years, consecutive, for use of a handgun in the commission of the crime against Curry;

Count 3: 30 years, consecutive, for the second degree murder of Deana Bell; and

Count 4: 20 years, concurrent, for use of a handgun in the crime of violence against Bell.

The court imposed an aggregate sentence of 80 years. Henry filed an appeal to this Court two days late, on April 29, 1998. Because he filed late, the appeal was dismissed on April 21, 1999, and the dismissal was recorded on May 26, 1999.

A post-conviction hearing was held eight years later, on May 14, 2007. By order of the Circuit Court for Prince George's County, Henry was granted a belated appeal. Pursuant to the court order, Henry filed this appeal on June 26, 2007.

## QUESTIONS PRESENTED

We have consolidated the questions presented by both parties as follows:

1) Did the circuit court err when it instructed the jury on the doctrine of transferred intent, where both the intended and unintended victims were killed?

2) Did the circuit court err when it declined to instruct the jury on the offense of involuntary manslaughter as to Deana Bell, the unintended victim?

3) Did the circuit court err in admitting evidence of a robbery in which Henry was involved, where the evi-

dence established that he recently had possession of a gun similar to that used in the instant crime?

4) Did the circuit court abuse its discretion when it denied Henry's request, made on the day of trial, for a continuance so that his mother could attempt to hire private counsel?

Because we answer "no" to all of the above questions, we shall affirm the judgment of the circuit court.

## FACTS

On July 14, 1997, William Curry, Ronald Patterson, and Zelma D. Codray, Jr. went out to celebrate Curry's completion of a work-related computer training course. The three men, who were all in their forties, went to 3103 Good Hope Avenue, Apartment 315, Temple Hills, Maryland, where Alfred Barfield resided. Curry wanted to collect money that Barfield owed him so that he and his friends could celebrate, but Barfield did not have the money. Curry argued with Barfield before leaving the apartment with Patterson and Codray.

On their way out, the three men passed Kevin D. Queen, Sr., Michael Chew, Deana Bell,[1] and Clarence Henry on the steps. What happened next was disputed at trial.[2] It was undisputed, however, that a verbal argument ensued between Curry and Chew, and it escalated into a physical fight. Curry, an ex-Marine who "worked out three, four times a week" at the gym, threw the first punch, striking Chew. The fight

---

1. Deana Bell and her mother, Dorisa Bell, lived with Barfield, Dorisa Bell's boyfriend.

2. According to Patterson, "one of the guys asked ... for a cigarette" and Patterson gave him one. When the person asked for another cigarette for his "lady friend," Curry told him to "get a job and buy some cigarettes." The person then asked Curry, Patterson, and Codray if they were cops, which prompted Curry to tell Patterson, "you ain't got to explain nothing to him, man ..." Codray's testimony was consistent with that of Patterson. According to Queen, however, the altercation started after Curry, Patterson, and Codray asked Chew if he had any drugs. Chew said, "I don't know you. You look like the police." Curry then "got kind of angry and they had a little argument."

moved from the front steps to the parking lot. Queen then came to Chew's defense, prompting Patterson to assist Curry. Henry was not involved in the fistfight. He was "down the street" when it started.

Henry left, came back with a sawed-off rifle, and began shooting at Curry. Queen testified to seeing Henry shooting "at the three guys." Upon hearing the shots, Patterson, Codray, and Queen all took cover. According to Patterson, it appeared that Henry was "trying to place his shots" to hit Curry and "miss his buddy." Patterson described the gun as a gun metal, sawed-off rifle, with a pistol grip and a pump action. It was approximately two feet long with a 16–inch barrel.

Henry struck Curry seven times, killing him. According to Dr. Jack Titus, an associate pathologist at the Chief Medical Examiner's Office, four of the seven gunshot wounds were to Curry's back side. Two bullets also struck Deana Bell, who was killed while sitting on the front steps of the apartment building.[3] Dr. Titus stated that one bullet entered the back of her left arm and came out through the front. The other bullet "entered the left chest, went through some skin and muscle and went through the left lung" before getting lodged in the left chamber of her heart.

When the firing stopped, Patterson and Codray came to Curry's aid. They tried to take Curry to their car but he collapsed before they could do so. Patterson then saw Henry, Queen, and Chew flee the scene so he went to call an ambulance. At trial, both Patterson and Codray identified Henry as the person who shot Curry.

Nine expended cartridge casings were recovered from the crime scene. In addition, a total of six bullets were recovered.

---

3. At trial, the State presented as Exhibit 2 a diagram of the crime scene as it appeared after the shooting. It included the location of both victims during the incident, as well as the location of cartridge casings that were recovered. According to the diagram, Deana Bell's body was found approximately 30 feet from the location where Curry stood at the time he was struck by the bullets.

Gary Phillips, a firearm examiner with the Prince George's County Police Department, testified that all nine of the recovered cartridge casings "had been fired in one single firearm." Similarly, all six recovered bullets "had been fired through . . . one firearm." Phillips added that the bullets were "fired from a weapon compatible with the same weapon that fired the nine casings." Without recovery and examination of the firearm, however, it was not possible to determine whether the bullets were fired from the same firearm that ejected the casings.

Additional facts will be supplemented in the relevant sections below.

## DISCUSSION

### I. Transferred Intent

■ Henry's first contention on appeal is that "the trial court committed plain error by instructing the jury on the doctrine of transferred intent where both the intended victim and the unintended victim were killed." We disagree. We first note that this issue was not preserved because Henry failed to object after the instruction for transferred intent was given to the jury. Maryland Rule 4–325(e) states that "[n]o party may assign as error the giving [of] . . . an instruction unless the party objects on the record promptly after the court instructs the jury, stating distinctly the matter to which the party objects and the grounds of the objection." We explained the importance of this rule in *McMillan v. State*, 181 Md.App. 298, 359, 956 A.2d 716, *cert. granted* 406 Md. 744, 962 A.2d 370 (2008):

> The policy behind the preservation rule is clear. The trial court cannot correct errors of which it is not informed. Only if a party takes exception to an error in the jury instruction does the court have the opportunity to correct it. *Johnson v. State*, 310 Md. 681, 686, 531 A.2d 675 (1987). . . . Put another way, considerations of fairness and judicial efficiency generally require that all challenges that a party wishes to make to a trial court's ruling, action, or conduct "be presented in the first instance to the trial court so that

(1) a proper record can be made with respect to the challenge, and (2) the other parties and the trial judge can respond to the challenge." *Chaney v. State*, 397 Md. 460, 468, 918 A.2d 506 (2007).

Henry himself concedes that "defense counsel did not object to the court's transferred intent instruction to the jury," but argues that this Court should still review it because the trial court's instruction constituted plain error. Maryland Rule 4–325(e) provides that "[a]n appellate court, on its own initiative or on the suggestion of a party, may ... take cognizance of any plain error in the instructions, material to the rights of the defendant, despite a failure to object." "But, 'there are some limitations on the affirmative act of noticing error. 1) There must be error. 2) It must be plain. 3) It must be material.'" *McMillan, supra*, 181 Md.App. at 359–60, 956 A.2d 716 (quoting *Morris v. State*, 153 Md.App. 480, 507 n. 1, 837 A.2d 248 (2003), *cert. denied*, 380 Md. 618, 846 A.2d 402 (2004)). Because this specific application of transferred intent—where both the intended and the unintended victims die—has not been addressed by an appellate court of this state, we will take up the invitation to decide the issue. After reviewing the evolution of the doctrine in Maryland, we conclude that the circuit court did not err in giving the transferred intent instruction.

In this case, the circuit court instructed the jury, with regard to transferred intent, as follows: [4]

... [T]he State has offered evidence of a concept called transferred intent. What it really means is that, for example, if there are three people, A, B, and C, and A intends to shoot C and either accidentally or in the process shoots B, the intent is transferred from C to B, the person who was actually shot.

---

4. As this case was tried in 1997, the court did not instruct the jury on the doctrine of "concurrent intent," which the Court of Appeals adopted seven years later in *Harrison v. State*, 382 Md. 477, 855 A.2d 1220 (2004).

Upon being informed that the jury "had no idea what was going on," the court re-instructed the jury:

> Let me explain this. Maybe you didn't get the transferred intent. We'll give you a—see if I can straighten that out. Let's say you have four people, four or five people, and A intends to shoot B, but in the process of doing it he shoots two other people, C and D. The intent to kill A is transferred to C or D or a third person. So if you—let me see, I see expressions on your faces.
>
> If I wanted to shoot say my clerk here and in the process of doing it I shoot Miss Mason or Mr. Maloney, then my intent to kill is transferred to those two people also in addition to myself, to my clerk. Do you all understand that? All right . . .

 The doctrine of transferred intent dates back to English common law. *Gladden v. State*, 273 Md. 383, 390, 330 A.2d 176 (1974).[5] Maryland expressly adopted it in 1974, when the *Gladden* Court held "that the *mens rea* of a defendant as to his intended victim will carry over and affix his culpability when such criminal conduct causes the death of an unintended victim." *Id.* at 405, 330 A.2d 176. The theory behind the doctrine is "that 'the state of mind which one has when about to commit a crime upon one person is considered by law to exist and to be equally applicable although the intended act affects another person.'" *Id.* at 404, 330 A.2d 176 (quoting W. Ritz, *Felony Murder, Transferred Intent, and*

---

5. In *U.S. v. Sampol*, 636 F.2d 621, 674 (D.C.Cir.1980), the United States Court of Appeals, District of Columbia Circuit held that, under the doctrine of transferred intent, one who intends to kill one person and kills a bystander instead is deemed to have committed whatever form of homicide would have been committed had he killed the intended victim, and there are even stronger grounds for applying such principle where the intended victim is killed by the same act that kills an unintended victim. *Gladden* was liberally cited as the state of the law in Maryland.

In *Sampol*, the defendants were prosecuted for the assassination of the former Chilean ambassador to the United States and an American associate. Seven defendants were charged with conspiracy to murder a foreign official, murder of a foreign official, first degree murder, and murder by use of explosives to blow up a vehicle engaged in interstate commerce.

*the Palsgraf Doctrine in the Criminal Law,* 16 Wash. & Lee L.Rev. 171 (1959)). It is "typically applied where a defendant, intending to kill A, shoots at but misses A and instead kills B, an unintended victim." *Poe v. State,* 341 Md. 523, 530, 671 A.2d 501 (1996) (citing *Gladden, supra,* 273 Md. at 390–92, 330 A.2d 176 and cases cited therein). Thus, transferred intent allows a shooter to be convicted of the first degree murder of an unintended victim. *See Poe,* 341 Md. at 530–31, 671 A.2d 501.

The next important transferred intent case is *Ford v. State,* 330 Md. 682, 625 A.2d 984 (1993), in which Ford was apprehended after he and "three other youths stood on or next to the Capital Beltway and hurled large landscaping rocks at vehicles traveling on the Beltway." *Id.* at 689, 625 A.2d 984. At trial, the circuit court "instructed the jury that if it found Ford assaulted with intent to disable the drivers, this intent could be transferred to the passengers." *Id.* at 708–09, 625 A.2d 984. Ford never objected to the instruction, and the Court of Appeals declined to invoke the plain error doctrine. The Court nevertheless commented, in dicta:

> ... [T]ransferred intent makes a whole crime out of two halves by joining the intent as to one victim with the harm caused to another victim. Transferred intent does *not* make two crimes out of one. Where the crime intended has actually been committed against the intended victim, transferred intent is unnecessary and should not be applied to acts against unintended victims. The California Court of Appeal made this point clearly when reversing one of two first-degree murder convictions of a defendant who intended to kill one victim and also accidentally killed a second victim. *People v. Birreuta,* 162 Cal.App.3d 454, 208 Cal.Rptr. 635 (1984).[6] *Id.* at 709, 712, 208 Cal.Rptr. 635 (emphasis in original). Following this line of reasoning, the Ford Court

---

6. This case has since been disapproved by the Supreme Court of California, in *People v. Bland,* 28 Cal.4th 313, 121 Cal.Rptr.2d 546, 48 P.3d 1107 (2002), which we will discuss, *infra.* It has also been overruled by *People v. Flood,* 18 Cal.4th 470, 76 Cal.Rptr.2d 180, 957 P.2d 869 (1998).

concluded that transferred intent did not apply to the crime of attempted murder because "[t]he completed crime has been committed on the intended victim" as soon as the attempt is made.[7] *Id.* at 714, 208 Cal.Rptr. 635.

Three years later, the Court of Appeals again discussed transferred intent in *Poe, supra,* 341 Md. 523, 671 A.2d 501 (1996). In *Poe,* the defendant, armed with a 12–gauge shotgun, intended to kill his estranged wife. *Id.* at 526, 671 A.2d 501. He fired one shot, which inflicted a nonfatal wound on his wife, but killed an innocent bystander. *Id.* at 525–26, 671 A.2d 501. Although it acknowledged that "[t]he doctrine of transferred intent is typically applied where a defendant, intending to kill A, shoots at but *misses* A and instead kills B, an unintended victim," the Court held that "transferred intent applies to the death of [the unintended victim] notwithstanding the fact that Mr. Poe actually hit and wounded Ms. Poe." *Id.* at 530–31, 671 A.2d 501 *(citing Gladden, supra,* 273 Md. at 390–92, 330 A.2d 176) (emphasis in original). The Court established the relevant inquiry as: what crime could Mr. Poe have been convicted of had he achieved his goal? *Id. (citing Gladden, supra,* 273 Md. at 393). In that case, Mr. Poe could have been convicted of the first degree murder of Ms. Poe and, therefore, he was liable for the first degree murder of the bystander. *Id.*

Six months after *Poe,* this Court discussed the doctrine of transferred intent at length in *Harvey v. State,* 111 Md.App. 401, 681 A.2d 628 (1996). In that case, neither the intended nor the unintended victim was killed, but the unintended victim was wounded. *Id.* at 405, 681 A.2d 628. We held that it was error for the circuit court "to have instructed the jury on the subject of transferred intent," because the doctrine does not apply to inchoate homicides. *Id.* at 433, 681 A.2d 628. Speaking for this Court, Judge Moylan stated, in dicta, that the fate of the *intended* victim is immaterial to the

---

**7.** The *Ford* Court disapproved the holding in *State v. Wilson,* 313 Md. 600, 546 A.2d 1041 (1988), in which the Court had applied transferred intent to attempted murder. *Ford, supra,* 330 Md. at 714, 625 A.2d 984.

application of transferred intent. *Id.* at 420, 681 A.2d 628. He concluded, *id.* at 422, 681 A.2d 628:

... [T]here is no doubt that the guilt of the defendant for the death of the unintended victim would be precisely the same in the *Poe* scenario, regardless of whether the intended victim 1) was hit and only wounded or 2) was hit and killed. The *actus reus* perpetrated on the unintended victim would have been precisely the same. The *mens rea* or malevolent state of mind of Poe, not subject to being "used up" or exhausted, would then have established the kind and level of blameworthiness for that unintended homicide.

Thus, the doctrine of transferred intent operates with full force whenever the unintended victim is hit and killed. It makes no difference whether the intended victim is 1) missed, 2) hit and killed, or 3) hit and only wounded.

This is inconsistent with the dictum in *Ford*, where the Court concluded that the application of the doctrine depends on the fate of the intended victim. Henry urges us to follow *Ford*, in which the *mens rea* and the *actus reus* "came together in one crime, the second degree specific intent murder of the intended victim," in his case, Mr. Curry. As we mentioned above, *Ford* relied on *Birreuta*, a California Court of Appeal case, which has since been disapproved by the California Supreme Court in *People v. Bland*, *supra*, 28 Cal.4th 313, 121 Cal.Rptr.2d 546, 48 P.3d 1107 (2002). Interestingly, the *Bland* Court relied on our decision in *Harvey*.

In *Bland*, the defendant "shot at three persons, killing one and injuring, but not killing, the other two." *Bland*, *supra*, 28 Cal.4th at 317, 121 Cal.Rptr.2d 546, 48 P.3d 1107. At the prosecution's urging, the court gave the jury instructions on transferred intent. *Id.* at 319, 121 Cal.Rptr.2d 546, 48 P.3d 1107. On appeal, the California Court of Appeal held that "the trial court erroneously instructed the jury on the doctrine of transferred intent." *Id.* at 318, 121 Cal.Rptr.2d 546, 48 P.3d 1107. The California Supreme Court granted certiorari, however, and held that "transferred intent applies even when the person kills the intended target. Intent to kill is not

limited to the specific target but extends to everyone actually killed." *Id.* at 317, 121 Cal.Rptr.2d 546, 48 P.3d 1107. In reaching this conclusion, the *Bland* Court "rejected the notion that transferring the intent uses it up." *Id.* at 325, 121 Cal.Rptr.2d 546, 48 P.3d 1107. It quoted the *Harvey* opinion:

"By thinking of the *mens rea* in such finite terms—as some discrete unit that must be either here or there—we have created a linguistic problem for ourselves where no real-life problem existed. Criminal *acts*, consummated or inchoate, are discrete events that can be both pinpointed and counted. A *mens rea*, by contrast, is an elastic thing of unlimited supply. It neither follows nor fails to follow the bullet. It does not go anywhere. It remains in the brain of the criminal actor and never moves ..."

"... The 'transferred' *mens rea vis-a-vis* the unintended victim or victims will not be affected in any way, therefore, by what happens to the intended victim."

*Id.* at 325–26, 121 Cal.Rptr.2d 546, 48 P.3d 1107 (quoting *Harvey, supra,* 111 Md.App. at 419–20, 681 A.2d 628) (emphasis in original).

Henry objects that *Harvey* is at odds with the Court of Appeals' view in *Ford.* We agree that it conflicts with some of the dicta in *Ford,* but the actual question presented in *Ford* was whether transferred intent applies to inchoate homicides. The *Ford* Court concluded that it does not. *See Poe, supra,* 341 Md. at 529, 671 A.2d 501. As the Court of Appeals explained in *Poe:* "In *Ford,* we made clear that if a defendant intends to kill a specific victim and instead wounds an unintended victim *without killing either,* the defendant can be convicted only of the attempted murder of the intended victim and transferred intent does not apply." *Id.* at 530, 671 A.2d 501 (emphasis added). It is for this reason that Henry's reliance on the recent opinions in *Garrett v. State,* 394 Md. 217, 905 A.2d 334 (2006), and *State v. Brady,* 393 Md. 502, 903 A.2d 870 (2006), is misplaced. In those cases, the defendants were charged with attempted first-degree murder and, therefore, the Court of Appeals held that the circuit court committed plain error when it gave the transferred intent instruction.

■ We are, of course, bound to follow the Court of Appeals' most recent pronouncement in *Poe* that transferred intent applies to the death of the [unintended victim] notwithstanding that fact that the shooter actually hit the intended victim.[8] Applying the *Poe* test, Henry certainly could have been convicted of the second degree murder of his intended victim and indeed, he was. We see no principled basis for distinguishing between cases in which the intended victim is killed and those in which he is simply wounded. For all of these reasons, we hold that the circuit court did not err, plain or otherwise, in instructing the jury on the doctrine of transferred intent where both the intended and the unintended victims were killed.[9]

## II. Involuntary Manslaughter

■ Next, Henry argues that "the trial court erred in refusing to instruct the jury on the offense of involuntary

---

8. This is consistent with the evolutionary development of the transferred intent doctrine. The "fate of the intended target is immaterial" when the "unintended victim" is killed. *See* Charles E. Moylan, Jr., Criminal Homicide Law § 3.23 (2002).

9. As we previously mentioned, this case was tried in 1997 and, thus, the court did not instruct the jury on the doctrine of "concurrent intent," as the Court of Appeals had not yet adopted it at that time. It is worth noting, however, that in this case, nine cartridge casings and six bullets were recovered at the crime scene. In addition, Deana Bell's body was found approximately 30 feet from Curry's location at the time he was shot. Therefore, we can infer that appellant created a "kill zone" " when he fired multiple shots at Curry, who, at that time, was standing in close proximity to Deana Bell." *See Harrison, supra,* 382 Md. at 495, 855 A.2d 1220 ("courts have permitted an inference that the defendant created a kill zone when a defendant . . . fired multiple bullets at an intended target"); *Ford, supra,* 330 Md. at 717, 625 A.2d 984 (stating that a "kill zone" is created when a "defendant escalate[s] his mode of attack from a single bullet aimed at [an intended target's] head to a hail of bullets"); and *Harvey, supra,* 111 Md.App. at 405, 434–35, 681 A.2d 628 (holding that the unintended victim was in the "kill zone" when she was standing "in close proximity" to the intended victim, at whose direction four shots were fired). When a "defendant has intentionally created a 'kill zone' to ensure the death of his primary victim, . . . the trier of fact may reasonably infer from the method employed an intent to kill others concurrent with the intent to kill the primary victim." *Ford, supra,* 330 Md. at 717, 625 A.2d 984.

manslaughter as to Deana Bell, the unintended victim." In addition to the doctrine of transferred intent, the jury was instructed on first degree murder, second degree murder with the intent to kill or inflict such serious bodily harm that death would be the likely result, and second degree depraved heart murder. Specifically, the court gave the following instruction as to depraved heart murder:

> Second degree depraved heart murder is the killing of another person while acting with an extreme disregard for human life. In order to convict the defendant of second degree murder as to Deana Bell the State must prove beyond a reasonable doubt that the conduct of the defendant caused the death of Miss Bell, that the defendant's conduct created a very high degree of risk to the life of Miss Bell and that the defendant, conscious of such risk, acted with extreme disregard of the life endangering consequences.

Henry contends that a manslaughter instruction should have been given because "[t]he jury should have been permitted to determine whether ... [Henry] acted with gross negligence and committed involuntary manslaughter, or whether ... he ... acted with extreme disregard of the life endangering consequences and committed depraved heart murder." *See* Maryland Criminal Pattern Jury Instructions § 4:17.8B (2006).

■ Maryland Rule 4–325(c) states that "[t]he court may, and at the request of any party shall, instruct the jury as to the applicable law and the extent to which the instructions are binding." The court, however, "need not grant a requested instruction if the matter is fairly covered by instructions actually given." *Id.* In *Evans v. State,* 174 Md.App. 549, 922 A.2d 620, *cert. denied,* 400 Md. 648, 929 A.2d 890 (2007), we held: "In determining the appropriateness of a given jury instruction, we 'must determine whether the requested instruction constitutes a correct statement of the law[;] whether it is applicable under the facts and circumstances of this case; and whether it has been fairly covered in the instructions

given.'" *Id.* at 567, 922 A.2d 620 (quoting *Stevenson v. State,* 163 Md.App. 691, 694, 882 A.2d 323 (2005) and cases cited); *see also Mack v. State,* 300 Md. 583, 592, 479 A.2d 1344 (1984). Generally, a circuit court's refusal to give a jury instruction will warrant reversal only upon a showing of abuse of discretion. *See Dean v. State,* 325 Md. 230, 240, 600 A.2d 409 (1992).

In this case, the requested instruction constitutes a correct statement of law. Our analysis, therefore, turns on whether an involuntary manslaughter instruction is applicable to the facts and circumstances of this case. In other words, we must ·determine whether the circuit court was required to give an instruction on the uncharged, lesser included offense of involuntary manslaughter.

In *Ball v. State,* 347 Md. 156, 699 A.2d 1170 (1997), *cert. denied,* 522 U.S. 1082, 118 S.Ct. 866, 139 L.Ed.2d 763 (1998), the Court of Appeals held that it is not incumbent upon the circuit court to give an instruction under Md. Rule 4–235(c) when a particular charge is not before the court. *Ball, supra,* 347 Md. at 190, 699 A.2d 1170 (citing *Dean, supra,* 325 Md. at 240, 600 A.2d 409); *see also Dishman v. State,* 352 Md. 279, 292, 721 A.2d 699 (1998) ("The threshold determination of whether the evidence is sufficient to generate the desired instruction is a question of law for the judge." (Citation omitted)). "Rather, a trial judge's obligation to propound a requested jury instruction on an uncharged, lesser offense is evaluated in light of the principles established in *Hook v. State,* 315 Md. 25, 553 A.2d 233 (1989), and its progeny." *Ball, supra,* 347 Md. at 190, 699 A.2d 1170 (citing *Hagans v. State,* 316 Md. 429, 455, 559 A.2d 792 (1989)).

The *Ball* Court explained the *Hook* test as follows:

In reviewing the denial of a request for an instruction on a lesser offense ... we must consider whether there exists, in light of the evidence presented at trial, a rational basis upon which the jury could have concluded that the defendant was guilty of the lesser offense, but not guilty of the greater offense. If a rational jury could not reach this conclusion,

then the judge need not submit the lesser offense to the jury.

*Id.* at 191, 699 A.2d 1170. In other words, "the test is not whether there is sufficient evidence to convict of the lesser included offense but whether the evidence is such 'that the jury could rationally convict only on the lesser included offense.'" *Burch v. State,* 346 Md. 253, 279, 696 A.2d 443 (1997) (quoting *Burrell v. State,* 340 Md. 426, 434, 667 A.2d 161 (1995)).

■ Applying this test to the instant case, the issue is whether the evidence was such that the jury could have convicted Henry of involuntary manslaughter and *not* depraved heart murder. Second degree depraved heart murder is "the killing of another person while acting with an extreme disregard for human life," while involuntary manslaughter is the killing of another person while acting "in a grossly negligent manner." Maryland Criminal Pattern Jury Instructions § 4:17.8. The distinction between the two is that malice is an element of second degree murder, but not of involuntary manslaughter. As we discussed in Section I, Henry's *mens rea* toward Curry, the intended victim, was transferred to Deana Bell, providing the necessary malice. This is the flaw in Henry's argument—he assumes that the doctrine of transferred intent does not apply.

In this case, where Henry fired at least nine shots into a crowd, from a sawed-off rifle, we do not see how any reasonable jury could conclude that his intent was anything other than an intent to kill Curry, or at least an intent to inflict such serious bodily harm that death was the likely result. Both of these intents suffice to prove malice. As such, we hold that the circuit court did not abuse its discretion when it refused to instruct the jury on the crime of involuntary manslaughter.

## III. Evidence of Other Crimes

■ Henry next argues that "the trial court abused its discretion by admitting evidence of other crimes." Prior to trial, Henry made a motion in limine to exclude all evidence

relating to his involvement in an armed robbery that took place on June 27, 1997, two and a half weeks prior to the killing of Curry and Bell. The State responded as follows:

What we have, Your Honor, is in the case we're trying today a rather distinctive kind of gun is used. A short barreled .22 rifle. They cut off the barrel and fire it. You can't actually tell if it's a rifle or shotgun when you don't fire it, but when the casings come out you know it's a rifle.

Two and a half weeks earlier a mile and a half away an older couple is robbed by the defendant. I'm not trying to get into the stuff about the robbery. I'm trying to get in he had possession of the gun which matches the description by the witnesses in our case.

I want to show he has possession of this gun. Especially after what happened in the motions hearing, where he said I didn't fire the gun or anything. The gun is never recovered. I want to be able to show he had possession of that gun ...

The court then denied Henry's motion, at which time Henry asked the judge to reconsider, explaining:

[The State] has witnesses in the homicide case that are going to come in and say, one, they saw Mr. Henry running in the direction towards Miss Bell, and ... Mr. Curry, saying they saw him firing a weapon, heard the shots being fired. I think that's enough evidence already from the witnesses he already has to suggest he did fire it.

Whether he used the sawed-off shotgun that was allegedly used in the armed robbery case or some other gun, it really doesn't matter. What matters is the State can place him there, can they state through their witnesses that he already has that, yes, this is the man that shot these two people? That's the only thing that's relevant in this case.

To allow him to introduce this other matter really risks the possibility of this case coming back, because ... common sense tells any rational juror, if I heard about someone charged in a murder case with a gun, being somewhere else

a couple weeks earlier with a gun, then that tends to indicate to me that he's done something else . . .

The court, however, still ruled that the evidence was admissible, finding:

> I think [the witnesses] just testify on a certain date they observed and they could identify the defendant. We observed him with a certain type of gun in his hand . . .

\* \* \*

> I think it goes to the weight. I think it's more probative [than prejudicial].

■ In *Streater v. State*, 352 Md. 800, 806, 724 A.2d 111 (1999), the Court of Appeals stated:

> The admissibility of other crimes or bad acts evidence . . . is governed by longstanding evidentiary principles that are currently embodied in Md. Rule 5–404(b):
>
> > **"Other Crimes, Wrongs, or Acts.**—Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, common scheme or plan, knowledge, identity, or absence of mistake or accident."

(Citations omitted). "Before evidence of prior bad acts or crimes may be admitted, the trial court must engage in a three-step analysis." *Hurst v. State*, 400 Md. 397, 408, 929 A.2d 157 (2007) (citing *State v. Faulkner*, 314 Md. 630, 634–35, 552 A.2d 896 (1989)). The three steps are as follows:

> First, the court must decide whether the evidence falls within an exception to Rule 5–404(b). Second, the court must decide 'whether the accused's involvement in the other crimes is established by clear and convincing evidence.' Finally, the court must balance the necessity for, and the

probative value of, the other crimes evidence against any undue prejudice likely to result from its admission.

*Id.* (citing *Faulkner, supra,* 314 Md. at 634–35, 552 A.2d 896).

In this case, Henry asserts that the circuit court "did not apply the three-step *Faulkner* test." We disagree and hold that the circuit court properly exercised discretion in admitting the evidence. First, the circuit court determined that the evidence would help "identify the defendant." In other words, evidence that Henry possessed a gun similar to that used in a prior crime fell within the "identity" exception to Rule 5–404(b). In *Wilkerson v. State,* 139 Md.App. 557, 572, 776 A.2d 685 (2001), *cert. denied,* 366 Md. 249, 783 A.2d 223 (2001), for example, we held that evidence the defendant was in possession of the murder weapon during a robbery eight days earlier was relevant to establish the identity of the murderer. *See also Emory v. State,* 101 Md.App. 585, 610–11, 647 A.2d 1243 (1994) ("[E]vidence of other offenses may be received under the identity exception if it shows ... that on another occasion the defendant was ... using certain objects used by the perpetrator of the crime at the time it was committed." (Citing *Faulkner, supra,* 314 Md. at 637–40, 552 A.2d 896)).

Contrary to Henry's contention, identity was at issue in this case because Henry never conceded that he was the shooter. Although defense counsel suggested, during opening statements, that Henry might invoke the doctrine of imperfect self-defense, counsel informed the court on the second day of trial that Henry would not be taking the stand. Instead, defense counsel stated that, if Henry testified, "he would deny that he even had possession of the weapon or that he was the one that fired the fatal shots." Henry also argues that the gun used on June 27th may not have been the same gun used on July 14th. We believe that this goes to the weight of the evidence and not its admissibility.

■ The second step of the *Faulkner* test asks the court to decide whether Henry's involvement in the other crime is established by clear and convincing evidence. On appeal, we look "only at the legal question of whether there was some

competent evidence which, if believed, could persuade the fact finder as to the existence of the fact in issue." *Emory, supra,* 101 Md.App. at 622, 647 A.2d 1243. In this case, the State offered evidence only to show that Henry possessed a gun similar to the one used in the murder. The State's witnesses were able to testify that they saw Henry with a sawed-off gun on June 27, 1997. The evidence was clear and convincing; this has not been challenged by Henry. Further, the State did not introduce evidence to show that Henry was involved in a robbery or any other crime.

The third and final step of the *Faulkner* test asks the court to balance the probative value of the evidence against any undue prejudice likely to result from its admission. In the instant case, the murder weapon was not recovered. Thus, the evidence of prior bad acts was significant because it tended to establish that Henry possessed a gun similar to the one used in the shooting, and that Henry had this gun in his possession just two weeks before the shooting took place. Any unfair prejudice likely to result from admission of the evidence was outweighed by its probative value, particularly where the details of the robbery itself were not presented to the jury. We hold that the circuit court properly exercised discretion in admitting the evidence.

### IV. Request to Discharge Counsel

Lastly, Henry asserts that the circuit court abused its discretion in denying his request to discharge his appointed counsel. Although the circuit court failed to comply with Maryland Rule 4–215(e), we hold that the rule was not triggered in this case because defense counsel simply requested a continuance so that Henry and his mother could attempt to hire private counsel. Henry himself did not indicate, prior to the start of trial, that he wished to discharge his attorney.

At the beginning of trial, the following exchange took place:

[DEFENSE COUNSEL]: Court's indulgence, Your Honor. I have one other matter just brought to my attention by Mr. Henry's mom, who's sitting in the courtroom. She just

informs me she's been in contact with Doug Wood with reference to representing Mr. Henry in this case, and she spoke with his office on Friday. Apparently he was supposed to contact me on Friday. I did not get a message from him. She spoke with his office again this morning. They're requesting that I request that this matter be continued to allow him to introduce—to enter this case so he can represent Mr. Henry.

[THE STATE]: Normally I don't have a problem with it, but this is the day of trial. We have the victim's mother coming from Ohio, drove all the way over the weekend to be here. This is more than the last second. We have a jury, 55 jurors on the way down here. I have to oppose.

THE COURT: I'm not going to grant the continuance. They waited too long. We have witnesses coming from out of state. It should have been done. This date was set months ago. They should have filed it long ago.

Henry argues that the court should have followed the procedures outlined in Maryland Rule 4–215(e), which states, in relevant part:

(e) **Discharge of counsel—Waiver.** If a defendant requests permission to discharge an attorney whose appearance has been entered, the court shall permit the defendant to explain the reasons for the request. If the court finds that there is a meritorious reason for the defendant's request, the court shall permit the discharge of counsel; continue the action if necessary; and advise the defendant that if new counsel does not enter an appearance by the next scheduled trial date, the action will proceed to trial with the defendant unrepresented by counsel. If the court finds no meritorious reason for the defendant's request, the court may not permit the discharge of counsel without first informing the defendant that the trial will proceed as scheduled with the defendant unrepresented by counsel if the defendant discharges counsel and does not have new counsel

. . .

In *State v. Campbell,* 385 Md. 616, 628, 870 A.2d 217 (2005), the Court of Appeals noted that "Maryland Rule 4–215(e) outlines the procedures a court must follow when a defendant desires to discharge his counsel to proceed pro se or to substitute counsel ..." In this case, however, Henry did not clearly indicate a present intent to discharge his attorney.

 Rule 4–215(e) "is silent as to what level of discourse is required to discharge counsel." *Campbell, supra,* 385 Md. at 629, 870 A.2d 217. The request does "not need to be a talismanic phrase or artfully worded to qualify as a request to discharge, so long as a court could reasonably conclude that [a person] sought to discharge his counsel." *Id.* at 632, 870 A.2d 217. In this case, defense counsel requested "that this matter be *continued* ..." and the circuit court responded: "I am not going to grant the *continuance.*" Thus, it appears that the court treated the request as a belated motion for a continuance, and we hold that there was no abuse of discretion in denying that request. *See Ware v. State,* 360 Md. 650, 706, 759 A.2d 764 (2000) ("It is settled that the decision whether to grant a postponement is within the sound discretion of the trial judge." (Citations omitted)).

The only explanation that defense counsel provided was that Henry's mother had "been in contact with Doug Wood" and that "she spoke with his office on Friday." Further, defense counsel stated that Wood was supposed to be in contact with him but that no message was ever received. It is unclear whether Wood had actually been retained, or whether he would definitely be retained in the near future. Because there was still uncertainty on the day of trial, the court did not abuse its discretion in denying defense counsel's motion.

Henry argues that this case is controlled by *Williams v. State,* 321 Md. 266, 582 A.2d 803 (1990). In that case, after the circuit court asked the clerk to arraign Williams, Williams said: "I want another representative." *Id.* at 267, 582 A.2d 803. Immediately, the circuit court responded, "Your motion is denied. This is the only Public Defender you are going to get." *Id.* As a result, the Court of Appeals held that the

circuit court erred in failing to permit Williams to explain reasons for requesting another appointed attorney. *Id.* at 274, 582 A.2d 803. The present case differs from *Williams,* however, because in *Williams* the defendant himself specifically asked for new counsel. In this case, Henry's defense counsel simply requested a continuance because there was a possibility that Henry's mother would retain private counsel.

After the denial of the motion to continue, the court proceeded to jury selection, opening statements, and heard testimony from seven witnesses. The following day, after hearing a large portion of the State's case, including, but not limited to, testimony that Henry was the shooter, defense counsel informed the court that Henry "was somewhat distraught and confused with respect to the posture of the case . . . [and] it's his intention not to take the stand." This affected defense counsel's trial strategy of arguing imperfect self-defense. As a result, the court addressed Henry:

> THE COURT: Is that your understanding? You don't want to take the stand? Is that true, sir?
>
> DEFENDANT: Yes, sir.
>
> THE COURT: All right. Let me ask you this before we go any further; before trial you indicated that his mother wanted to change attorneys.
>
> [DEFENSE COUNSEL]: Yes. She wanted to hire Doug Wood.
>
> THE COURT: Did she give you any reason why?
>
> [DEFENSE COUNSEL]: No.
>
> THE COURT: Do you know any reason why?
>
> [DEFENSE COUNSEL]: I know it was late primarily in talking with her because apparently—I didn't know this, his father recently passed. I wasn't aware of this. And she was waiting on the insurance settlement and she was just—
>
> THE COURT: That's not the reason she gave you?
>
> [DEFENSE COUNSEL]: The reason why she wanted to change attorneys? THE COURT: Yes.

[DEFENSE COUNSEL]: I guess she didn't feel comfortable. She didn't come right out and say it, but her tone of voice—

THE COURT: That's not a good enough reason.

[THE STATE]: Was this all with the mother, not the defendant? Is this all discussions with the mother?

THE COURT: Prior to trial.

[DEFENSE COUNSEL]: He said that to me, and then I went over and asked the mother what was he talking about, and she was the one that said, well, she had told him to tell me that they wanted to hire Mr. Wood.

THE COURT: For no good reason? I mean outside you feel that she thinks Mr. Wood—Maybe Mr. Wood was taller than you are.

[DEFENSE COUNSEL]: Mr. Wood has a greater reputation.

THE COURT: Do you know the reason?

DEFENDANT: I guess we wasn't getting well represented or something.

THE COURT: Well, okay. I don't see much merit in that claim, so we'll proceed with the trial. You're going to have to make the best of it you can.

■ Later, the court again clarified its finding that it was unnecessary to continue the case so that Henry could employ new counsel. At that time, defense counsel argued that, under the rules, the court was obligated to go into more detail on the record. Specifically, defense counsel suggested that the court had to ask Henry the reason for his request. This prompted the following response:

THE COURT: I did, but I have—he's only 17 or 16 years old, and the fact that he's still a juvenile, I think his mother was the person we were concerned here with, and the defendant's answer was that he—something about representation, which didn't make sense to me. You may be a little younger than Mr. Wood. I think you're a very competent attorney and can handle this case.

Without any other type of sufficient evidence to the contrary, I deny the motion for mistrial and continuance and the discharging of you.

 At this point in the trial, Rule 4–215(e) no longer applied. *See State v. Brown,* 342 Md. 404, 428, 676 A.2d 513 (1996) (concluding that "Rule 4–215(e) does not apply to decisions to discharge counsel after trial has begun"). Instead, the trial judge was to consider the following factors:

(1) the merit of the reason for discharge; (2) the quality of counsel's representation prior to the request; (3) the disruptive effect, if any, that discharge would have on the proceedings; (4) the timing of the request; (5) the complexity and stage of the proceedings; and (6) any prior requests by the defendant to discharge counsel.

*Id.* (citations omitted).

Upon review of the proceedings, we believe that the trial judge considered the necessary factors. Before trial continued on the second day, the judge asked Henry the reason for making his request and, after hearing Henry's response, found the reason to be without merit. At this stage of the trial, the judge already had the opportunity to hear and evaluate defense counsel's performance. As such, he was able to assess the quality of representation that Henry received.[10] This satisfies the first and second factors of *Brown.* With regard to the third, fourth, and fifth factors, by the time Henry requested new counsel, the jury had already heard a large portion of the State's case. In addition, the State notified the court that arrangements had already been made for witnesses to come from out of state. Allowing Henry to discharge counsel at that time would, therefore, disrupt and further complicate the proceedings. In fact, the court would have been forced to grant a mistrial. As for the sixth *Brown* factor, we believe that the circuit court did consider defense counsel's prior requests for a continuance. But, because there

---

**10.** Additionally, we note that defense counsel ultimately had some success representing Henry's interests, as he was able to obtain acquittals on the first degree murder charges.

was no clear indication that the defendant wished to discharge his attorney, or that private counsel would actually have been retained, the court properly exercised its discretion in denying Henry's request.

██ Finally, Henry argues that the court, upon finding that the reasons for his request lacked merit, failed to advise him of the right to represent himself. As we previously stated, however, Rule 4–215(e) does not apply after trial has already commenced. As such, we hold that the circuit court did not commit reversible error in denying Henry's request to retain new counsel.

For the foregoing reasons, we affirm the judgment of the circuit court.

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**