74 A.3d 746

Charles THOMAS

v.

STATE of Maryland.

No. 2071, Sept. Term, 2011.

Court of Special Appeals of Maryland.

Sept. 4, 2013.

392

Julia C. Schiller (Paul B. DeWolfe, Public Defender, on the brief), Baltimore, MD, for Appellant.

Sarah P. Pritzlaff (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for Appellee.

Panel: WOODWARD, GRAEFF, JAMES A. KENNEY, III (Retired, Specially Assigned), JJ.

GRAEFF, J.

Appellant, Charles Thomas, was convicted by a jury in the Circuit Court for Baltimore City, of first degree murder, use of a handgun in the commission of a felony or crime of violence, and wearing, carrying, or transporting a handgun. The court sentenced appellant to life imprisonment, all but 50 years suspended, for first degree murder and 20 years, consecutive, for the use of a handgun in the commission of a felony or crime of violence.

On appeal, appellant presents four questions for our review, which we have revised slightly as follows:

1. Did the trial court err in granting the State's motion to compel recordings of two witness statements, which were made by State's witnesses to a defense investigator?

2. Did the trial court abuse its discretion in admitting prior inconsistent statements?

3. Did the court err in admitting other crimes evidence?

4. Did the motions court err in denying the defense motion to suppress two out-of-court identifications made based on a photo array?

For the following reasons, we shall affirm the judgments of the circuit court.

## FACTUAL AND PROCEDURAL BACKGROUND

Alvin Alston was shot on September 13, 2009, at approximately 12:00 p.m. near the corner of Coldspring Lane and Reisterstown Road, in Baltimore City, Maryland. Mr. Alston later died at a local hospital of gunshot wounds to the head. The manner of death was determined to be homicide.

Eyewitnesses to the murder were interviewed by the Baltimore City Police Department. Detective Aaron Cruz, the primary investigator in this case, spoke with Anthony Jordan on September 30, 2009, and Mr. Jordan informed him that appellant was the shooter. Mr. Jordan was nervous and concerned for his safety. Mr. Jordan was shown a photo array, and he identified appellant in about "30, 40 seconds. It was relatively quick." Mr. Jordan also gave a statement at that time.

On November 23, 2009, Detective Cruz spoke with Latrice Wilson. Ms. Wilson arrived at the police station with her children, and her children waited in a witness waiting room. Ms. Wilson was then shown a photo array and identified appellant as the shooter.

On October 15, 2009, appellant was arrested. He provided police with two addresses; one was the home of his sister, and the other was the home of his girlfriend. Both addresses were located within blocks of the murder scene. Detective Cruz also testified that the location where appellant and the victim, Mr. Alston, previously had been arrested in an unrelated case was located less than a mile away.[1]

---

1. This prior arrest is the subject of appellant's claim that the court erred in admitting other crimes evidence.

On cross-examination, Detective Cruz agreed that he received information that the victim, Mr. Alston, was selling drugs on the day of the murder. Six bags of heroin were recovered from Mr. Alston's person.

Detective Daniel Nicholson was present with Detective Cruz when Mr. Jordan was shown a photographic array. The array initially was face down, and Mr. Jordan was read a set of instructions informing him that the array may or may not contain a picture of a subject in connection with the investigation. After this, Mr. Jordan turned the array over, and within seconds, Mr. Jordan selected a photograph of appellant. Mr. Jordan also wrote a statement on the back of the array; the police did not tell Mr. Jordan what to write in making that identification.

Detective Marvin Sydnor was present during Ms. Wilson's viewing of the photographic array on November 23, 2009. Ms. Wilson also made an identification within seconds and wrote on the back of the array why she made the identification. Detective Sydnor testified that Ms. Wilson identified only one person from the array; she did not identify anyone else as the shooter or indicate that she knew anyone in the array.

Mr. Jordan testified that he was selling newspapers at the pertinent intersection, located near a Burger King, when he observed a young man shoot Mr. Alston. Mr. Jordan testified that Mr. Alston was known to him as a "hustler," a "drug dealer." Mr. Jordan heard Mr. Alston say: "Oh, no," and then he heard two gunshots. Thereafter, Mr. Jordan saw a "young man in a black hoodie" get into a Jeep. Mr. Jordan maintained that he did not "see no facial" of the shooter, and he did not know if the man in the hoodie was the shooter.

The day of the shooting, Mr. Jordan went to the police station and gave a statement.[2] Mr. Jordan testified that he

---

2. According to Detective Cruz, Detective McGrath interviewed Mr. Jordan at this time. Detective McGrath did not testify at trial. Mr. Jordan's statement to Detective McGrath is the subject of appellant's second question presented.

did not identify the shooter to the police because he had not seen anyone's "facial."

A couple months later, according to Mr. Jordan, Detective Cruz asked him to come back to the police station.[3] Mr. Jordan testified that the police detained him for several hours. At some point, Detective Nicholson told him: "If I even thought you had something, mm-mm to do with it I will lock you up." Afterwards, Mr. Jordan was asked to make an identification. Mr. Jordan claimed he needed to pick someone or be detained. He testified that the police used a piece of paper to highlight certain photographs during the process.

Mr. Jordan then testified that, on two occasions, he had spoken to a defense investigator, Mr. Donald Jacobs. He recalled telling Mr. Jacobs that he had been treated unfairly by police, but he was not sure if he told Mr. Jacobs that the police told him who to pick out in the array.

Mr. Jordan was presented with a copy of the photo array. He agreed that his signature appeared on both the front and the back of the document. His statement on the back of the array read: "On the corner of Reisterstown and Coldspring I witnessed that a young man shot Alvin two times."

Over objection, Mr. Jordan's prior statement to police, taken on the day of the shooting, was played into evidence for the jury. In this statement, Mr. Jordan states that a person wearing a black hoodie got out of a Jeep, approached the victim, and said something to Mr. Alston, to which Mr. Alston replied: "Oh, no." The person in the hoodie then shot Mr. Alston two times in the head, got back into the Jeep, and fled the scene. Mr. Jordan denied that he had ever seen the shooter before.

Mr. Jordan also was presented at trial with a transcript of the recorded statement taken on September 30, 2009, when he was interviewed by Detective Cruz and shown a photo array. Mr. Jordan agreed that the police asked him at the end of that

---

3. Detective Cruz indicated that this second interview with police occurred approximately two weeks after the shooting, on September 30, 2009.

interview if he had been threatened, and Mr. Jordan denied that he had been. He also agreed that he told police that he came to the station that day freely and voluntarily, and that he had not been promised anything in exchange for his statement.

On cross-examination, Mr. Jordan maintained that he never saw the shooter's face. When asked by defense counsel if he told police that he "glanced at the person," Mr. Jordan testified that he "did not see no one."

On redirect, Mr. Jordan was presented with an audio tape cassette recording of his statement to Detective Cruz on September 30, 2009, and he agreed that he signed the cassette. Over defense objection, the State then played the tape for the jury. During that interview, Mr. Jordan stated that he "glanced" at the shooter. When asked by the officer whether he "recognized who he was," Mr. Jordan replied: "Right."

Ms. Wilson testified that she was in the area of the shooting. Her car had stalled, and she was sitting inside her vehicle when she saw a van arrive. After the van left, four men were standing nearby. One man was standing on the corner "fiddling with some papers." Moments later, a man wearing a hoodie pulled out a gun and shot the man with the papers twice in the back of the head. Ms. Wilson described the shooter as being a tall, African American male, wearing a black pullover hoodie, jeans, and white "tenners." Ms. Wilson saw the gun and described it as a "silver, revolver."

Ms. Wilson saw the shooter's face. She had seen him before in the neighborhood, but she did not know this man's name. Ms. Wilson saw the shooter put the gun back in his waistband, then run away from the area.

After the police arrived on the scene, Ms. Wilson was able to restart her car, and she went to the police station. After waiting in the police waiting room, Ms. Wilson spoke with Detective Cruz and gave a statement consistent with her testimony.[4]

---

**4.** Detective Cruz testified that he did not speak to Ms. Wilson the day of the shooting; Ms. Wilson was interviewed by Detective Ellsworth. Detective Ellsworth did not testify at trial.

On November 23, 2009, the day of her daughter's birthday, police officers arrived at Ms. Wilson's residence and demanded that she accompany them to the police station to make an identification. They threatened to arrest her if she did not come with them at that time.

At the station, Ms. Wilson was presented with a photo array, which she signed on the front and back, indicating that she picked out a photograph of the shooter. Ms. Wilson wrote on the back: "I saw the man in the photo shoot another man in the back of the head. I was on west Coldspring." Ms. Wilson testified that none of the detectives told her who to pick or what to write. Ms. Wilson initially identified appellant at trial as the person she saw at the time of the shooting. Subsequently, however, she stated that she saw appellant at the scene, but she did not see appellant shoot the victim.

On cross-examination, Ms. Wilson agreed that she previously had testified that she initially picked out a photo other than appellant's from the array, and Detective Cruz told her "stop playing," "come on, you know who the guy is." She also testified that the shooter was "definitely taller than the victim because the way he was standing over top of him."

On redirect examination, Ms. Wilson testified that she told Detective Cruz that appellant was there, but he was not the shooter. She testified at trial that appellant was not the shooter in this case, stating: "[N]o, he did not shoot the victim."

Over defense objection, the jury then heard a recorded statement Ms. Wilson gave to a defense investigator, Mr. Jacobs.[5] Ms. Wilson told Mr. Jacobs that she did not remember anything about the shooting. When asked about the photo array, Ms. Wilson told Mr. Jacobs she did not remember what the shooter looked like, but she did remember making an identification from a photo array. She then told Mr. Jacobs that she did remember some details of the shoot-

---

5. The playing of this statement to the defense investigator is a subject of appellant's second question presented.

ing, including that four men got out of the van, that the shooter shot the victim in the head, and that, afterwards, the shooter ran toward her stalled car while the other two men ran in the opposite direction. Ms. Wilson also told Mr. Jacobs that she hesitated in picking out a photo from the array because she believed she saw a photo of a man she had seen on prior occasions in the company of her father-in-law. She concluded by again telling Mr. Jacobs that she could not remember details from the shooting.

On recross-examination, defense counsel asked about conflicts between her cross-examination, stating that the shooter walked away, and her interview with Mr. Jacobs, stating that the shooter ran. Ms. Wilson testified that the shooter walked toward her location and did not run from the scene.

A gun was not found in connection with this case, but several pieces of ballistic evidence were recovered. A live round recovered near the scene of the shooting was a Winchester nine millimeter Luger. Two shell casings recovered near the body were also nine millimeter Lugers. These shell casings were determined to have been fired from the same firearm. A DNA test was performed on the bullet, and the results were inconclusive.

Regarding motive, the jury learned that, after Mr. Alston was pronounced dead, Detective Cruz went to the hospital and spoke with Randolph Alston, the victim's brother. After this conversation, and after reviewing witness statements, Detective Cruz learned that the victim previously had been arrested, with appellant and another individual, for conspiracy to distribute heroin and related charges that carried a potential sentence of 40 years incarceration.

Three days prior to the murder, a court date relating to that charge was postponed. By the time of what would have been the ninth scheduled trial date, because Mr. Alston, the person the State alleged to have been actually selling the drugs, was deceased, the prosecutor offered plea agreements to appellant and Marvin Brown, who then pleaded guilty and received sentences of time served. Appellant was not in jail the day

Mr. Alston was shot, but the third individual, Mr. Brown, was incarcerated at the time of the murder.

We shall include additional details in the following discussion.

## DISCUSSION

### I.

Appellant contends that the trial court erred in granting the State's motion to compel production of statements that two State's witnesses made to a defense investigator. He asserts that the statements were not discoverable because the defense did not intend to use the statements at trial, and the statements were protected under the work product doctrine.

The State disagrees. It asserts that "the trial court properly determined that two audio recordings of State's witnesses made by a defense investigator were subject to discovery by the State, and the trial court properly exercised its discretion to compel disclosure after conducting an in camera review of the recordings."

### A.

**Proceedings Below**

Prior to trial, the State filed, pursuant to Maryland Rule 4–263(e)(6), a motion to compel disclosure of recorded statements the defense obtained from Mr. Jordan and Ms. Wilson. Defense counsel argued that the recordings of these State's witnesses, obtained by the defense investigator, Mr. Jacobs, were not discoverable because they were attorney work product, and he did not intend to use the recordings at trial. After further inquiry, however, defense counsel confirmed that, if these witnesses testified "to something different, then at that point in time the material would be used as impeachment material." [6]

---

6. Mr. Jacobs, the defense investigator who made the recordings, was identified as a defense witness prior to trial.

The court ordered the defense to provide the recordings to the court for an *in camera* review. After its review, the court ordered disclosure of the recordings of Mr. Jordan and Ms. Wilson to the State. With respect to appellant's claim of protection pursuant to the work product doctrine, the court found, *inter alia,* that the recordings of Mr. Jordan and Ms. Wilson did not include opinions, thoughts, or conclusions of defense counsel, but instead, they were recordings of facts from the witnesses.

**B.**

**Maryland Rule 4–263(e)(6)**

Maryland Rule 4–263 sets forth the discovery requirements of the parties in a criminal case. The obligations of the defense are set forth, in relevant part, as follows:

(e) **Disclosure by Defense.** Without the necessity of a request, the defense shall provide to the State's Attorney:
* * *

(6) Documents, Computer-generated Evidence, and Other Things. The opportunity to inspect, copy, and photograph any documents, computer-generated evidence as defined in Rule 2–504.3(a), recordings, photographs, or other tangible things that the defense intends to use at a hearing or at trial.
* * *

(g) **Matters Not Discoverable.** (1) By any Party. Notwithstanding any other provision of this Rule, neither the State's Attorney nor the defense is required to disclose (A) the mental impressions, trial strategy, personal beliefs, or other privileged attorney work product or (B) any other material or information if the court finds that its disclosure is not constitutionally required and would entail a substantial risk of harm to any person that outweighs the interest in disclosure.

The Court of Appeals has explained the underlying policies of the discovery rules:

We have often stated that the scope of pretrial disclosure requirements under Maryland Rule 4–263 must be defined in light of the underlying policies of the rule. . . . Inherent benefits of discovery include providing adequate information to both parties to facilitate informed pleas, ensuring thorough and effective cross-examination, and expediting the trial process by diminishing the need for continuances to deal with unfamiliar information presented at trial.

*Williams v. State*, 364 Md. 160, 172, 771 A.2d 1082 (2001).

■ In reviewing a trial court's decision whether a party is required to disclose information, we note that "[d]iscovery questions generally 'involve a very broad discretion that is to be exercised by the trial courts. Their determinations will be disturbed on appellate review only if there is an abuse of discretion.' " *Cole v. State*, 378 Md. 42, 55, 835 A.2d 600 (2003) (quoting *North River Ins. Co. v. Mayor and City Council of Baltimore*, 343 Md. 34, 47, 680 A.2d 480 (1996)). Factual findings of the trial court will not be reversed unless clearly erroneous, but the question whether a discovery violation occurred under the Maryland Rules is reviewed *de novo*. *Id.* at 55–56, 835 A.2d 600. Where a discovery rule has been violated, the remedy is "in the first instance, within the sound discretion of the trial judge. The exercise of that discretion includes evaluating whether a discovery violation has caused prejudice." *Id.* at 56, 680 A.2d 480.

Here, the circuit court properly determined that the defense violated Rule 4–263(e)(6) by refusing to provide the recordings. Contrary to appellant's claims on appeal, the record shows that appellant intended to use the statements of Mr. Jordan and Ms. Wilson if the witnesses testified to something different from what was stated in the recordings. *See State v. Young*, 94 Or.App. 683, 767 P.2d 90, 93 (1989) ("if defense counsel, even though not certain, can 'reasonably predict' that she will use certain exhibits to impeach a State's witness, she must give timely discovery to the prosecutor"); *State v. Dunivin*, 65 Wash.App. 728, 829 P.2d 799, 801–02 (a prosecutor "intends to use" a document for purpose of the discovery

rule where the State is "aware of the document and there is a reasonable possibility that the document will be used during any phase of the trial"), *review denied,* 120 Wash.2d 1016, 844 P.2d 436 (1992). Thus, the trial court properly exercised its discretion to review the recordings *in camera* and then to order that the statements be disclosed to the State.

### C.

**Work Product**

 We also agree with the trial court that the statements were not protected from disclosure under the work product doctrine. The work product doctrine "protects materials prepared in anticipation of litigation from disclosure." *Blair v. State,* 130 Md.App. 571, 607, 747 A.2d 702 (2000). *Accord E.I. du Pont de Nemours & Co. v. Forma–Pack, Inc.,* 351 Md. 396, 407, 718 A.2d 1129 (1998). There are two categories of attorney work product, fact and opinion, included in this doctrine. *Id.*

 "Fact work product generally consists of 'materials gathered by counsel (or at counsel's instructions) in preparation of trial.'" *Blair,* 130 Md.App. at 607, 747 A.2d 702 (quoting JOSEPH F. MURPHY, JR., MARYLAND EVIDENCE HANDBOOK § 904(A) (3d ed. 1999)). A witness' statement generally is considered fact work product. *Id.* at 608, 747 A.2d 702.

 Opinion work product concerns the attorney's mental processes. *Id.* at 607, 747 A.2d 702. Although both fact and opinion work product generally are not discoverable, opinion work product " 'is almost always completely protected [from] disclosure.' " *Id.* at 608, 747 A.2d 702 (quoting *Forma–Pack,* 351 Md. at 408, 718 A.2d 1129). By contrast, " 'as the work product of the attorney becomes less a matter of creative legal thought and more a mere recognition of observed fact, the work product becomes increasingly susceptible to discovery.' " *Id.* (quoting *Duplan Corp. v. Deering Milliken, Inc.,* 397 F.Supp. 1146, 1200 (D.S.C.1974)). Thus, fact work product may be subject to disclosure. *See Morris v. State,* 59

Md.App. 659, 669, 477 A.2d 1206 (1984) (the doctrine "was never intended to be an evidentiary privilege").

Here, the circuit court, after listening to the recordings, found that the statements of Mr. Jordan and Ms. Wilson to appellant's defense investigator were fact work product. The court stated, and appellant does not dispute, that the recordings did not reveal the creative thought processes or mental impressions of counsel, but rather, they conveyed only the verbatim factual content of the witnesses' statements.

Other states addressing similar situations have determined that such statements from witnesses are not protected from disclosure under the work product doctrine. *See People v. Lego*, 116 Ill.2d 323, 107 Ill.Dec. 647, 507 N.E.2d 800, 805 (1987) (order compelling defense to produce tape recordings made by defendant's investigators of State witnesses did not violate work product rule because "[t]he verbatim statements of witnesses obtained by the investigator here do not fall within the scope of protection afforded by the rule"), *cert. denied*, 488 U.S. 902, 109 S.Ct. 251, 102 L.Ed.2d 240 (1988); *State v. Culkin*, 791 S.W.2d 803, 811 (Mo.Ct.App.1990) (rejecting claim that notes of interview between defense counsel and a State's witness constituted work product because they did not include "opinions, theories or conclusions" of attorney); *People v. Perez*, 171 Misc.2d 75, 653 N.Y.S.2d 527, 529 (Sup.Ct. 1996) (tapes of defense interviews of State's witnesses not work product, noting that recorded interviews "are unlikely to contain opinions, theories or conclusions of defense counsel").

We agree with this analysis. Disclosure of a defense investigator's recorded statement of the State's witness, which contains only the verbatim statements of the witness, does not violate the work product doctrine. The circuit court's decision, to direct disclosure of the recordings after its *in camera* review, was not erroneous and does not entitle appellant to a new trial.

## II.

Appellant next challenges the admission of two prior statements made by Mr. Jordan and Ms. Wilson, Mr. Jordan's

statement to the police and Ms. Wilson's statement to the defense investigator. He contends that the State failed to lay the proper foundation under Maryland Rule 5–613 to impeach the witnesses with the prior statements.

The State disagrees. It argues that Maryland Rule 5–613, which governs the use of prior inconsistent statements when offered to impeach a witness' testimony, was inapplicable here because the statements were offered pursuant to Rule 5–802.1(a), which pertains to the admission of prior inconsistent statements as substantive evidence.

■■■ The general rule regarding the admissibility of evidence is as follows:

A ruling on the admissibility of evidence ordinarily is within the trial court's discretion. *Blair v. State*, 130 Md.App. 571, 592, 747 A.2d 702 (2000). This Court generally reviews such rulings for an abuse of discretion. *State v. Simms*, 420 Md. 705, 724–25, 25 A.3d 144 (2011). "An abuse of discretion occurs 'where no reasonable person would take the view adopted by the [trial] court,' or when the court acts 'without reference to any guiding rules or principles.'" *Brass Metal Prods. v. E–J Enters.*, 189 Md.App. 310, 364, 984 A.2d 361 (2009) (quoting *King v. State*, 407 Md. 682, 697, 967 A.2d 790 (2009)).

*Hajireen v. State*, 203 Md.App. 537, 552, 39 A.3d 105 *cert. denied*, 429 Md. 306, 55 A.3d 908 (2012).

■■■ As appellant notes, Maryland Rule 5–613 permits impeachment of a witness' credibility by evidence that the witness made a prior statement that is inconsistent with his or her in-court testimony, but only if a sufficient foundation first has been established. The Rule provides:

(a) **Examining witness concerning prior statement.** A party examining a witness about a prior written or oral statement made by the witness need not show it to the witness or disclose its contents at that time, provided that before the end of the examination (1) the statement, if written, is disclosed to the witness and the parties, or if the statement is oral, the contents of the statement and the

circumstances under which it was made, including the persons to whom it was made, are disclosed to the witness and (2) the witness is given an opportunity to explain or deny it.

(b) **Extrinsic evidence of prior inconsistent statement of witness.** Unless the interests of justice otherwise require, extrinsic evidence of a prior inconsistent statement by a witness is not admissible under this Rule (1) until the requirements of section (a) have been met and the witness has failed to admit having made the statement and (2) unless the statement concerns a non-collateral matter.

In *Hardison v. State*, 118 Md.App. 225, 702 A.2d 444 (1997), this Court explained:

Maryland Rule 5–616 permits extrinsic evidence of prior inconsistent statements to be used for the purpose of impeachment, in accordance with Maryland Rule 5–613(b). Under Rule 5–613(b), for extrinsic evidence of a witness's prior inconsistent oral statement to be admissible for impeachment, the following foundation must be laid: 1) the contents of the statement and the circumstances under which it was made, including the person to whom it was made, must have been disclosed to the witness during his trial testimony; 2) the witness must have been given the opportunity to explain or deny the statement; 3) the witness must have failed to admit having made the statement; and 4) the statement must concern a noncollateral matter. Before the requirements of Rule 5–613(b) come into play, however, the prior statement of the witness must be established as inconsistent with his trial testimony. *See Stevenson v. State*, 94 Md.App. 715, 721, 619 A.2d 155, 158 (1993).

*Id.* at 237–38, 702 A.2d 444.

These foundational requirements, however, apply only when the prior inconsistent statement is offered to impeach. As this Court indicated in *Pinkney v. State*, 151 Md.App. 311, 322–23, 827 A.2d 124, *cert. denied*, 377 Md. 276, 833 A.2d 32 (2003), when extrinsic evidence of a prior inconsistent statement is offered as substantive evidence, Maryland Rule 5–802.1 controls. We explained that Rule 5–802.1 "does not

contain the same foundational requirements as Rule 5–613."
*Id.* at 323, 827 A.2d 124.

Maryland Rule 5–802.1 provides in pertinent part:

The following statements previously made by a witness
who testifies at trial or hearing and who is subject to cross-
examination concerning the statement are not excluded by
the hearsay rule:

(a) A statement that is inconsistent with the declarant's
testimony, if the statement was (1) given under oath subject
to the penalty of perjury at a trial, hearing, or other
proceeding or in a deposition; (2) reduced to writing and
signed by the declarant; or (3) recorded in substantially
verbatim fashion by stenographic or electronic means con-
temporaneously with the making of the statement.

Here, the prior statements, which were recorded by elec-
tronic means, met the requirement of this rule. Appellant
does not contend otherwise. Rather, he argues only that the
foundational elements of Rule 5–613(b) were not satisfied.
Because the statements were admissible as substantive evi-
dence, however, Rule 5–613(b), regarding admissibility as im-
peachment, is inapplicable.

### III.

Appellant next asserts that the trial court erred in
admitting evidence of other crimes, specifically, evidence that
appellant had charges pending against him relating to an
undercover drug buy involving the victim and Mr. Brown.
The State disagrees, arguing that the court properly admitted
the evidence.

At the motions hearing, the State proffered the following:

The State would like to move into evidence that on Novem-
ber 15th, 2007 in the 3600 block of Woodlawn Avenue the
Defendant, Charles Thomas unlawfully engaged in a con-
spiracy with the victim in this case Alvin Alston and another
man, Marvin Brown Jr . . . . to distribute heroin.

That all three men were indicted on this and later charges by a grand jury for the city of Baltimore. . . . And that these charges were still pending against all three of those Defendants at the time of Mr. Alston's murder on September 13th, 2009.

The State asserted that evidence of these other crimes was specially relevant to establish motive, intent, and identity in this case, explaining that the State's theory was that appellant killed Mr. Alston because Mr. Alston "refused to take the charge." The State's proffer continued:

It's the State's proffer that the three Defendant[s] in that narcotics case were offered individual pleas. The plea offer to Mr. Thomas was a plea for suspended sentence.

The plea offer to Mr. Brown was jail time and the plea offer to the victim in this case, Mr. Alston was also jail time.

At the time of their arrest, which was on the same date at the same time, all three men were given bail and all three men made bail and were released from custody pending trial. So there was a series of postponements in this case where all three of the co-defendants were on bail.

However, unfortunately for Mr. Brown, the third co-defendant in that narcotics case, Mr. Brown had a violation of probation warrant issued as a result of this arrest. And although it wasn't served for almost a year, he was eventually locked up and was awaiting a no bail hearing on his violation of probation. And so was in jail as these cases continued to come up. Now Mr. Brown obviously was going to jail in any event. Mr. Alvin Alston again was offered jail time, but was on the street. And Mr. Thomas was offered a suspended sentence. And so, if he went to trial—and the State was refusing to sever the cases—Mr. Brown faced a significantly long jail time or jail term because he was facing felony narcotics cases. So the State would proffer that the motive in this case is to get rid of Mr. Alston so that the State's case either falls apart or that they could now accept

the pleas that Mr. Brown and Mr. Thomas were apparently going to do.

The State argued the evidence was specially relevant:

As you will hear, the State's evidence will show that Mr. Alston was gunned down at about noon on a Sunday in September of 2009 by a gunman. There was no robbery attempt, no argument, no fight. He was approached and shot and killed.

This evidence would also be offered, Your Honor, to show intent that it wasn't enough to hurt Mr. Alston in this case. That would not have done Mr. Thomas any good. Mr. Thomas had to do away with Mr. Alston in order for him to stay out of jail.

And finally, Your Honor, the State has a statement that was taken from Mr. Thomas at the time of his arrest on these cases. And in that statement the Defendant says that he had no reason to kill Mr. Alston. And so this evidence would be probative to whether he did in fact have an intent to kill Mr. Alvin Alston.

The State contended that its evidence was clear and convincing, informing the court that the court records, the testimony of the prosecuting attorney in the narcotics case, and the audio and video recording of that narcotics transaction involving appellant, Mr. Alston, and Mr. Brown, would show appellant's involvement in that other crime. The State also argued that the probative value of this evidence outweighed the danger of unfair prejudice:

[T]his is so much a part and parcel of the State's case and this homicide that absent this evidence the jury will see this in a vacuum. They'll have no history. They'll have no understanding if there was or was not any relationship.

The State's witnesses in the case do not know the participants. And so, there's no background other than this information that the State would offer as identity and motive information.

Defense counsel argued that the evidence did not establish motive in this case, asserting that, because the prior charges

originated in 2007, the evidence was "too remote," and he further argued that the evidence was unfairly prejudicial. With respect to the remoteness argument, the prosecutor clarified that the drug case had been postponed on September 10, 2009, and Mr. Alston was murdered three days later, on September 13, 2009.

At the conclusion of the motions hearing, the court stated that it was "satisfied that the evidence in this case certainly goes to motive and could quite arguably go to identity." It also found that the other crimes evidence was clear and convincing under the second step of the other crimes analysis. Finally, the court determined that the probative value substantially outweighed any danger of unfair prejudice. The court stated: "I have done the balancing analysis and I'm satisfied that any prejudicial value in this case is outweighed by its probative value. I'm satisfied further that there is a genuine necessity in this case to—for the evidence. Accordingly it will be admitted." As explained below, we perceive no error in the court's findings.

▮▮▮ To determine the admissibility of the other crimes evidence, the court must engage in a three-step analysis. *Hurst v. State*, 400 Md. 397, 407, 929 A.2d 157 (2007) (citing *State v. Faulkner*, 314 Md. 630, 634–35, 552 A.2d 896 (1989)). First, the evidence must fall within one of the exceptions listed in Rule 5–404(b), or otherwise have special relevance to some contested issue in the case. *Thompson v. State*, 181 Md.App. 74, 84, 955 A.2d 802 (citing *Faulkner*, 314 Md. at 634–35, 552 A.2d 896), *cert. granted*, 406 Md. 744, 962 A.2d 371 (2008). The determination of whether evidence has special relevance is a legal determination that does not involve any exercise of discretion. *State v. Westpoint*, 404 Md. 455, 489, 947 A.2d 519 (2008) (citing *Wynn v. State*, 351 Md. 307, 317, 718 A.2d 588 (1998)).

▮▮▮ After determining whether the contested evidence falls within an exception to the general bar on the use of other crimes evidence, the court must find that the accused's involvement in the other crimes is established by clear and

convincing evidence. *Henry v. State,* 184 Md.App. 146, 168, 964 A.2d 678 (2009) (quoting *Faulkner,* 314 Md. at 634–35, 552 A.2d 896), *aff'd on other grounds,* 419 Md. 588, 19 A.3d 944 (2011). This Court "will review this decision to determine whether the evidence was sufficient to support the trial judge's finding." *Faulkner,* 314 Md. at 635, 552 A.2d 896. In conducting this review on appeal, "we look 'only at the legal question of whether there was some competent evidence which, if believed, could persuade the fact finder as to the existence of the fact in issue.' " *Henry,* 184 Md.App. at 168–69, 964 A.2d 678 (quoting *Emory v. State,* 101 Md.App. 585, 622, 647 A.2d 1243 (1994)).

██ If that requirement is met, the trial court then must weigh the necessity for and probative value of the other crimes evidence against any undue prejudice likely to result from its admission. *Id.* at 167–68, 964 A.2d 678. The trial court's conclusion to admit or deny this evidence based on its probative value will be reviewed under an abuse of discretion standard. *See Faulkner,* 314 Md. at 641, 552 A.2d 896 ("A decision to admit other crimes evidence which is clearly incorrect 'on this question of balancing probative value against danger of prejudice will be corrected on appeal as an abuse of discretion.' ") (quoting *Brafman v. State,* 38 Md.App. 465, 474, 381 A.2d 687 (1978)).

Here, we agree with the trial court's assessment that the evidence of appellant's involvement in the prior narcotics activity with the victim was specially relevant to establish motive. *See Conyers v. State,* 345 Md. 525, 554, 693 A.2d 781 (1997) ("[M]otive is one of the 'other purposes' that will overcome the presumption of exclusion that pertains to 'other crimes' evidence"). As the State explains in its brief:

> [Appellant] and [Mr.] Alston had been arrested and charged with engaging in a drug conspiracy and [appellant's] ability to take advantage of a plea offer that included a suspended sentence, rather than facing up to 40 years[ ] imprisonment, was dependent upon [Mr.] Alston's agreement to also enter a guilty plea and serve jail time. [Mr.] Alston, however,

was not "taking the charge," as evidenced by the numerous postponements in the case. Just three days after the last postponement, [appellant] killed [Mr.] Alston in an execution-style shooting. From this evidence, an inference could be drawn that [appellant's] motive to murder [Mr.] Alston was to get him "out of the picture" so that [appellant] would not have to serve any time on the other crime.

Appellant's argument that the evidence was too remote in time is devoid of merit. Although the crime occurred in 2007, the case was still pending, with the last postponement occurring three days prior to the murder. The evidence was relevant to show appellant's motive to kill, i.e., whether appellant decided, as the prosecutor argued in closing argument, to "sacrifice the life of Alvin Alston to save his own."

Turning to the next step of the other crimes analysis, the State contended that its evidence was clear and convincing, informing the court that the court records, the testimony of the prosecuting attorney in the narcotics case, and the audio and video recording of that narcotics transaction involving appellant, Mr. Alston and Mr. Brown, would show appellant's involvement in that other crime. Appellant does not contest the court's finding that there was clear and convincing evidence of the other crimes.

Thus, we turn to the last prong of the analysis, whether the probative value of the prior narcotics case outweighed any undue prejudice. As the prosecution argued, there was little explanation why Mr. Alston was murdered absent the challenged evidence, and therefore, the evidence was of considerable probative value.

With respect to balancing the probative value against the danger of unfair prejudice, this Court has explained:

This final balancing between probative value and unfair prejudice is something that is entrusted to the wide discretion of the trial judge. The appellate standard of review, therefore, is the highly deferential abuse-of-discretion standard. The fact that we might have struck the balance otherwise is beside the point. We know of no case where a

trial judge was ever held to have abused his discretion in this final weighing process. As a practical matter, that will almost never be held to have occurred. A properly disciplined appellate court will not reverse an exercise of discretion because it thinks the trial judge's decision was wrong. That would be substituting its judgment for that of the trial court, which is inappropriate if not forbidden. Reversal should be reserved for those rare and bizarre exercises of discretion that are, in the judgment of the appellate court, not only wrong but flagrantly and outrageously so.

*Oesby v. State,* 142 Md.App. 144, 167–68, 788 A.2d 662, *cert. denied,* 369 Md. 181, 798 A.2d 553 (2002). There was no abuse of discretion in this case.

## IV.

Appellant's final contention is that the trial court erred in not suppressing the pre-trial identifications that Mr. Jordan and Ms. Wilson made from the photographic arrays. In support, he asserts that the witnesses were coerced into making their identifications and they subsequently disavowed these identifications of appellant as the shooter.

The State argues that the court properly denied the motion to suppress. It contends that the identifications were not suggestive and that any disavowal by the witnesses of their out-of-court identifications properly was left to the jury.

## A.

### Proceedings Below

On September 30, 2009, Mr. Jordan was asked to respond to the Baltimore City Police Department, where he met with Detective Cruz and Detective Nicholson. Mr. Jordan testified that he was detained in a cell for one to two hours and then shown a photographic array. He initially did not identify anyone, but eventually, he picked out a photo "just to get out the police department." Mr. Jordan maintained that he did not see anyone's "facial" during the incident, and he claimed that the police would have detained him if he did not pick out someone in the array. Mr. Jordan agreed that he wrote on

the photo he selected: "On the corner of Reisterstown and Coldspring I witnessed that young man shot Alvin . . . two times." He testified, however, that he could not say if that same person was in court at the time of the motions hearing.

On cross-examination, Mr. Jordan confirmed that Detective Cruz never informed him that the police had a suspect or that he wanted Mr. Jordan to identify someone. Mr. Jordan agreed that all the men in the array were African–American, had similar appearances, and that no one of the pictures stood out from the rest. Only two police officers were with him at the time he made the identification, and he was not handcuffed at any time. After making the identification, Mr. Jordan went home.

Detective Cruz testified that he met Mr. Jordan at the homicide office at approximately 12:30 p.m. on September 30, 2009. He showed Mr. Jordan a photographic array involving the murder of Mr. Alston. Appellant's photograph was in the array, and no other suspects were included.

Detective Cruz testified that the array included six African–American males, all with similar characteristics. Neither he, nor Detective Nicholson, told Mr. Jordan who to pick. They did not point to any suspect and did not tell Mr. Jordan that they had a picture of appellant. Detective Cruz denied marking the photographs in any way to suggest who Mr. Jordan should pick. Detective Cruz agreed that Mr. Jordan did not pick out a photograph immediately, noting that Mr. Jordan was "nervous" and "concerned for his safety." Subsequently, however, Mr. Jordan picked out appellant's photograph, and he wrote a statement on the back of the array.

Detective Nicholson corroborated Detective Cruz's testimony at the motions hearing. Mr. Jordan waited in a witness waiting room for an hour to an hour and a half before Detective Cruz arrived at the police station. After Detective Cruz arrived, and they showed Mr. Jordan the array in an interview room, Mr. Jordan picked out appellant's photograph within "[a] few seconds."

Detective Nicholson did not tell Mr. Jordan who to pick out, and he did not tell him that a suspect was included in the array. Mr. Jordan was never handcuffed, nor placed in a detention cell, and he left of his own volition after speaking with police.

Ms. Wilson testified that, on November 23, 2009, she was told to come to the police station to view an array or else "I would be arrested." Ms. Wilson told the police that she was "pissed" because it was her daughter's birthday, and she did not want to assist the police.

When Ms. Wilson was shown the array at the police station, she initially identified two separate photographs, was told "no" by one of the detectives and asked to look again. Ms. Wilson then picked out appellant's photograph, testifying that she identified him because he "was there that day." When asked if the third person she picked was the shooter, Ms. Wilson testified that she said "yes" because she "was just pissed at that point and I was ready to leave." When asked during the motions hearing why she picked this individual, Ms. Wilson testified: "I remembered his face being there that day standing next to the victim. That's why I picked him." Ms. Wilson agreed, however, that she signed the array and wrote: "I saw this man shot the victim in the head."

Detective Cruz was recalled, and he testified that the array was shown to Ms. Wilson in November due to scheduling issues. Ms. Wilson arrived at the police station in her own vehicle and was accompanied by two of her children. Detective Cruz interviewed Ms. Wilson with Detective Sydnor. During the showing of the array, Ms. Wilson appeared "nervous" and "concerned about her safety." Ms. Wilson never informed the police that she had a child's birthday party scheduled at the time. Detective Cruz agreed, however, that Ms. Wilson did not "want to be in the police station."

Detective Cruz did not force Ms. Wilson to look at any photographs, did not tell Ms. Wilson who to pick out, and he did not threaten her. He denied telling Ms. Wilson that the array included possible suspects, testifying: "I just told her

that we had some photos that we wanted her to look at." Ms. Wilson made an identification "relatively quick," within "30 seconds or so." Ms. Wilson wrote a statement on the back of the array and did not express any desire to leave prior to making the identification.

After argument, the motions court denied the motion to suppress both Mr. Jordan's and Ms. Wilson's identifications. The court stated that the identification procedures were neither illegal nor impermissibly suggestive.

## B.

### Standard of Review

This Court has explained that the scope of appellate review of a trial court's denial of a motion to suppress an out-of-court identification is as follows:

> "We view the evidence and inferences that may be reasonably drawn therefrom in a light most favorable to the prevailing party on the motion, and will uphold the motions court's findings unless they are clearly erroneous. We must make an independent constitutional evaluation, however, by reviewing the relevant law and applying it to the unique facts and circumstances of the case."

*In re Matthew S.*, 199 Md.App. 436, 447, 23 A.3d 250 (2011) (quoting *Gatewood v. State*, 158 Md.App. 458, 475–76, 857 A.2d 590 (2004)).

## C.

### Pre-trial Identifications

 Maryland law establishes "a two-stage inquiry for due process challenges to extrajudicial identifications." *Jones v. State*, 310 Md. 569, 577, 530 A.2d 743 (1987), *vacated on other grounds*, 486 U.S. 1050, 108 S.Ct. 2815, 100 L.Ed.2d 916 (1988). *Accord In re: Matthew S.*, 199 Md.App. at 447, 23 A.3d 250. The first question to be considered is "whether the identification procedure was impermissibly suggestive." *Evans v. State*, 304 Md. 487, 498, 499 A.2d 1261 (1985), *cert. denied*, 478 U.S. 1010, 106 S.Ct. 3310, 92 L.Ed.2d 722 (1986).

The defense initially must show "some unnecessary suggestiveness in the procedures employed by the police." *Brockington v. State*, 85 Md.App. 165, 172, 582 A.2d 568 (1990), *cert. denied*, 322 Md. 613, 589 A.2d 57 (1991).

Suggestiveness exists where the police, in effect, say to the witness: "This is the man." *Jones*, 310 Md. at 577, 530 A.2d 743. If the out-of-court identification was not made under suggestive circumstances, the inquiry ends and the identification evidence is admissible. *Id. Accord Webster v. State*, 299 Md. 581, 620, 474 A.2d 1305 (1984). *See also Wood v. State*, 196 Md.App. 146, 160–61, 7 A.3d 1115 (2010) (appellate court does not reach any issue concerning reliability of the identification if the confrontation was not impermissibly suggestive), *cert. denied*, 418 Md. 192, 13 A.3d 800 (2011).

If, however, the identification was tainted by suggestiveness, the inquiry proceeds to a second stage, in which the trial court assesses "whether, under the totality of the circumstances, the identification was reliable." *Jones*, 310 Md. at 577, 530 A.2d 743. *See also Conyers v. State*, 115 Md.App. 114, 120, 691 A.2d 802 ("[R]eliability was never put forth by the Supreme Court as an additional ground for excluding an extrajudicial identification. It was, by diametric contrast, a severe limitation on such exclusion."), *cert. denied*, 346 Md. 371, 697 A.2d 111 (1997). The factors to be used in determining reliability include:

"(i) the opportunity of the witness to view the criminal at the time of the crime;

(ii) the witness' degree of attention;

(iii) the accuracy of the witness' prior description of the criminal;

(iv) the level of certainty demonstrated by the witness at the confrontation; and

(v) the length of time between the crime and the confrontation."

*Jones*, 310 Md. at 578, 530 A.2d 743 (quoting *Webster v. State*, 299 Md. 581, 607, 474 A.2d 1305 (1984)).

Here, there was conflicting testimony about the identifications. Mr. Jordan claimed that he was detained for up to two hours, and initially, he did not identify anyone. He further claimed that the police suggested who he should pick out by moving a piece of paper over the array in an attempt to narrow down his selection. Mr. Jordan maintained that he did not see anyone's "facial," but eventually, he selected a photograph. In contrast, Detective Cruz testified that neither he, nor Detective Nicholson, pointed to any suspect, told Mr. Jordan that they had a picture of appellant, or marked the array in any way to suggest who Mr. Jordan should pick.

With respect to Ms. Wilson's identification, she claimed that she was threatened with arrest if she did not come to the police station to make an identification. She also testified that she initially identified people in the array other than appellant and the police told her she was wrong. She stated that she picked out a photograph because she saw that individual at the scene of the shooting.

Ms. Wilson's version of events, however, was contradicted by Detective Cruz, who testified that he did not tell her who to pick. He further stated that, after Ms. Wilson flipped over the array, she made an identification within "[n]o more than 30 seconds or so, something like that. It was relatively quick."

The motions court, after considering the credibility of the witnesses, did not err in finding that the identification procedure was not impermissibly suggestive. We note that appellant does not argue that the array itself was impermissibly suggestive. Rather, he asserts that the motion to suppress should have been granted because the witnesses were detained and coerced.

As this Court has explained:

Impermissibly suggestive police misbehavior, even assuming it to have been the case, which we do not, is not a category that embraces every variety of police misbehavior. We offer an extreme hypothetical simply to make the point. Even if it were to be assumed that the police dragged a

witness screaming into the police station, rudely shoved her down in front of a "mug" book containing a thousand photographs, and threatened her that if she did not pick out one of them within the hour they would shoot her on the spot, such behavior would no doubt be improper. It would not, however, be impermissibly suggestive. To do something impermissibly suggestive is not to pressure or to browbeat a witness to make an identification but only to feed the witness clues as to which identification to make. THE SIN IS TO CONTAMINATE THE TEST BY SLIPPING THE ANSWER TO THE TESTEE. All other improprieties are beside the point.

*Conyers*, 115 Md.App. at 121, 691 A.2d 802.

Even if the court believed that Mr. Jones was detained prior to his identification or that Ms. Wilson was threatened with arrest if she did not come to the station, that does not constitute impermissible suggestiveness. And the circuit court was entitled to credit Detective Cruz's testimony that there was no action by the police suggesting which photo to select. Under these circumstances, the circuit court did not err in finding that the pre-trial identifications were not impermissibly suggestive and in denying the motion to suppress.

**JUDGMENTS AFFIRMED. COSTS TO BE PAID BY APPELLANT.**